Ms. Mar? Am I pronouncing it right? Or Mayor? Mar? Either one. Well, come on, it's got to be one or the other. They can't both be right. They are. Mayor. Mayor. All right, Ms. Mayor. You have reserved three minutes for rebuttal, so you have seven minutes to start. Thank you. Your Honors, I represent the petitioner appellant Julian Marquez. Mr. Marquez is serving a 50-year sentence with an executed suspension after 35 years for a 2006 conviction in Connecticut State Court for felony murder and related robbery charges. This habeas appeal addresses the district court's order, the Connecticut district court's order, which reviewed two different Connecticut Supreme Court decisions. A 2009 decision of the Connecticut Supreme Court, which addressed Mr. Marquez's claims that the pretrial identifications were unduly suggestive and tainted the in-trial identifications, as well as a separate 2019 Connecticut Supreme Court order, which addressed Mr. Marquez's claims regarding Brady. First, I just want to start with my point one, which is the Connecticut Supreme Court's 2009 determinations. And it's our position that the photographic arrays that were shown to Mr. Valley and Mr. Clement, they were two victims of the robbery, were not unnecessarily suggestive, was an unreasonable application of clearly established federal law. So what federal law, what Supreme Court precedent did the Connecticut Supreme Court overlook? They overlooked Manson v. Brathwaite's- Well, it quoted- I mean, it didn't overlook it in the sense that it certainly acknowledged it. Right, but they didn't- they acknowledged it, but they didn't understand or the significance of that particular case as to the facts here. You know, for several reasons, not just the fact that the arrays were simultaneous, but the- But Supreme Court has never said that arrays have to be done in a particular way, have they? No, they haven't. And that's why I'm saying, for reasons other than the fact that these were simultaneous, the totality of the circumstances here demonstrates that these were pretrial identifications that were unnecessarily suggestive. And they tainted the witnesses' subsequent in-court identification- But that, I mean, it just seems like you're- Particularly Mr. Clement's- They mentioned- What did the Supreme Court tell them they couldn't do that they did? Well, overall, looking at the totality of the circumstances here, they ignored the fact that there were other issues aside from these simultaneous arrays. There was Detective Bodan's actions of telling Mr. Clement that he had chosen the right photo, the same one that Mr. Valley had chosen. And there's testimony that Mr. Clement had thought about choosing a different photo initially before he chose Mr. Valley's. But that's a real- That's really, it seems to me, a challenge to the in-court identification, not to the out-of-court. In other words, the identification had already taken place after the offensive comments by the- Okay, so, Your Honor, to answer your question, aside from the fact that this was simultaneous arrays, looking at the composition of the arrays, there were problems here. Only Mr. Marquez's photo contained a large white ruler in the background. Only Mr. Marquez's photo had yellow lighting on there, which made his photo brighter than the other photos. We had the lead detective, in this case, who was conducting the photo arrays, which is also suggestive- This is your argument that it should be a double-blind process, that the person showing the arrays should know who the person- That's part of it. But the Supreme Court hasn't said that either, right? Correct, but that's part of it. I'm arguing- I guess, what is it that the Supreme Court has said you can't do that the Connecticut Supreme Court did? Essentially, they said that you can't have an array that's unduly suggestive, and you need to look at the totality of the circumstances. And looking at the totality of the circumstances, particularly the fact that this- One fact that it was simultaneous, but again, nothing in and of itself, cumulatively. You've got the simultaneous presentation. You've got the fact that it's being conducted by the lead detective. You've got the fact that the photograph of Mr. Marquez is different than the other photographs. Are you also going to include the fact where Valley walked into the probation office and said, hey, that's the gunman. That's that guy who was in the apartment who committed the robbery, before any photo array came up. He just saw the guy. He said, hey, that's the guy. But that's Mr. Valley. I'm talking- I thought you were complaining about both Clement and Valley. Are you limiting yourself to Clement? Well, I would say that the issue was greater with Clement than with Mr. Valley. I mean, Mr. Valley was shown- I mean, I don't see how that's an issue at all with Valley. I mean, he saw the guy in the room, and he said, that's the guy. So even assuming, which I'm not going to agree with, that there was no issue with Valley, there were definitely issues with Clement. And the fact that the detective made this comment post-identification is a problem with law in this circuit as well. And that's something- He made the comment post-identification. Correct. Correct. And Valley's comment was made post-identification. And this was contrary to clearly established federal law in this- No, no. It's contrary to the Second Circuit. Correct. That's what I was about to say. But it has to be Supreme Court law for Connecticut to be in trouble, right? And clearly established law means Supreme Court law. It doesn't mean Second Circuit law. Would you agree with that? Well, I would argue that there is not clearly established Supreme Court law that I can point to as your Honor has- Well, then you lose. Well- That's what 2254 says.  I mean, we think we're pretty good, but we're not binding on the Connecticut Supreme Court for purposes of 2254. So I'm going to just move on to point two right now because I actually think I have very little time, and I'd like to address that. I rely on my brief for any other information as to point one. But with respect to point two, it's our position that there was a Brady violation here. And from the record here, there was an unwritten and or implicit understanding between the state and the cooperating witness, Mr. Solar, that he would potentially benefit if he testified against Mr. Marquez. But even if we assume that, I mean, how do you beat this Strickland two prong, the second prong in Strickland, which is prejudice? I mean, basically, the witness was pretty much crossed on this, wasn't he? He was crossed on this, but there was also testimony on direct. And the prosecutor went and had a redirect saying that you wouldn't lie about this, that there was no agreement. And he basically testified that he was going to be telling the truth, that there was no agreement. So- It turns on the materiality of the purported Brady material, right? Correct. And the Connecticut Supreme Court acknowledged that and said, well, we're going to assume that there was a failure to disclose. We're going to ask whether it's material. And they dug into the facts of the trial, right? Well, they did to some extent, but not deeply enough. So what's the standard under 2254? They don't have to get it right. Well, there was a- They just can't be wildly, stupendously wrong, right? Well, I would say that here it was stupendously wrong because Mr. Solar was the only cooperator that testified as to what happened. The other two- His cellmate who basically said that Marquez concocted a story to wrongly inculpate Solar. I mean, there is other evidence, right? There is other evidence, but you have two complaining witnesses who were drinking for three hours before this occurred. They're sitting in a dark apartment. They don't have very detailed descriptions of the perpetrator themselves. Neither one of them saw the gun being discharged. One of them heard three shots before calling 911. This wasn't a situation where they had a good opportunity to look at the gunman. But it's not like they picked Judge Nardini and said he's the guy. I mean, there's no dispute that your client was there at the apartment, right? The only dispute is who fired the gun. Right, because he confessed to that, right? He confessed. Didn't he make a post-arrest statement saying it was there? Your Honor, the issue here is whether his Brady rights were violated. Wait, wait, wait. Wait, counsel. Didn't he admit post-arrest that he was there? Your Honor, that is not my recollection, but perhaps you are correct. I may be wrong. Yeah, that is not my recollection. Nobody was there to buy marijuana. That was, yeah, he was there to buy marijuana. That's what his, that's what Solar said. That's what Solar said? That's my recollection. I could be wrong. That was what Solar testified to. And that's why there was no testimony about what happened at the incident, what led up to it and what happened afterwards, except coming from Mr. Solar. And you have a situation here in Connecticut where prosecutors are trying to get around, they are successfully getting around Brady by entering into implicit understandings with cooperating witnesses in order to avoid, you know, impeachment material at trial. And this really is something that the jury should have heard and the jury should have decided whether they believed it or not. And I know I've gone over, so. Yeah, she's got three minutes of rebuttal. Yes. We'll hear from you again. Thank you. Yes. We'll now hear from, I'm sorry, I lost my little sheet. Ms. Zulek. You got it right. Okay. Like a broken clock, once in a while I get them right. You may proceed. Good morning. I am Joanne Zulek, and I represent the respondent appellee in this matter. In both claims brought by the appellant petitioner, he alleges that the Connecticut Supreme Court unreasonably decided two cases against him. And the first claim concerns an issue that arose on direct appeal regarding the eyewitness identification. And the second was the Brady claim that arose in a post-conviction proceeding and concerned the cooperating witness. Since this time, I will let you know, Connecticut has changed its policies. In October 2019, the Connecticut Chief State's Attorney did in fact issue a policy indicating that all cooperation agreements must be in writing. So the danger pointed out by opposing counsel has been looked at by the prosecutors within this state, and a new policy has been issued since this case was decided. The issue doesn't seem to me whether it was in writing. The issue seems to me as to whether it was implicit and backed into in kind of a cagey way so that there wouldn't be an agreement and then you don't have to reveal it. But that does seem disreputable. During the criminal trial, this issue arose and was addressed, and the prosecutor said in open court, not in front of the jury, but in front of the trial court and defense counsel and Mr. Marquez, that he and Mr. Solart's attorney had engaged in discussions. The discussions revealed that there may be leniency after Mr. Solart testified, but he couldn't say what kind of- There was no agreement, so when you say- There was no agreement. There's a new rule that takes care of this kind of cagey, kind of sneaky behavior that actual agreements have to be in writing. Well, this wasn't in writing. You just sort of avoid making an agreement that's explicit, but it's understood among the members of the defense bar that this is the thing that's going to happen. Am I wrong? It is a hope among the defense bar that their clients will cooperate and testify truthfully at trial. Well, that doesn't always happen, which is why prosecutors cannot promise leniency. Well, usually the promise of leniency is conditioned upon the giving of truthful testimony, among other things. Correct, but we want to make sure that before we say, we're going to drop this charge, we're going to give you a definite sentence of this, that we've actually seen with our own eyes what they've done, that they have cooperated. But that's what you're saying you do now. You do the written cooperation agreement, I assume. Yes. It says conditioned upon your truthful cooperation, et cetera, et cetera, then you will get benefit X. Correct. So it's not like it's impossible. I mean, that's what you've decided to do going forward. Yes. But in any event, I guess the point here is not with the policy, it's now the point is whether or not what happens at the trial for Mr. Marquez resulted in him not getting a fair trial, right? That's correct. That's the ultimate issue. And the Connecticut Supreme Court decided that whether or not there was an agreement for leniency really didn't matter because the evidence was overwhelming in this case, and thus that information was not material. You have two witnesses. You have Mr. Valley and you have Mr. Clemens. They both identify the petitioner as the person with the gun. You have Mr. Solar. Yes. He's tainted a bit because he is the co-defendant. But he also says it's Mr. Marquez with the gun. You have Mr. Marquez, who does give a statement to the police, and in that statement he says, yes, I was there. And at one point, Mr. Solar gave me the gun, and I held it on the victims as he collected their belongings. And then he gave it back to me, and that's when the killing ensued. You also have an individual that he met while in prison. So you have all of this evidence that he was there, that he held the gun, and ultimately you have the two witnesses, Valley and Clement, who say, yeah, he's the one who killed our friend. And so given all of that, some sort of testimony from Solar that he had a vague hope in the future, which he did say he had, he had a hope that his attorney would get him the best possible deal. So the materiality from the other side would, I suppose, be the degree of certainty or uncertainty that Mr. Solar had as to what the prosecution would or wouldn't do because he was cross and he did admit that he had this hope of some benefit of leniency if he testified. And I guess the other side is saying, well, he could have been crossed as to a somewhat moderately higher degree of expectation that that was going to happen. I think that's a fair summary. And so even without having to get to the issue of whether or not there was an explicit promise made, which was the claim in the state courts that there was an agreement for a reduced charge? Because at that point, Mr. Solar was facing felony murder charges. So the claim in the state courts was not that there was some sort of nebulous understanding. The claim in the state courts was that there was an agreement for a reduced charge. If there are no further questions? All right. Thank you. Thank you. I hear from Ms. Mayer for, did I get it right or did I get it wrong? You're good. Thank you. Perfect. For three minutes. So first I just want to point out that at the trial, Mr. Solar never admitted that he was hoping for reduced charges. He flat out lied. He said he was asked on direct by the prosecutor who knew that there had been discussions. Okay, in exchange for that, did the state make any promises to you such that if you testify, certain benefits will come to you? Answer, no, sir. Later on, he's asked on cross, you know, why he's testifying. That's why you're here testifying today, right? You want to help your own situation. He says, I'm testifying because it's the right thing to do. The prosecutor then says to him on cross, but certainly you expect to get some consideration for your effort here in testifying today. He says, no, I don't. Then the prosecutor says, and you're hoping the state's attorney is going to drop that felony murder charge against you because you're testifying here today, right? He says, I don't know. The prosecutor says, you don't know? You keep saying the prosecutor. You mean the defense lawyer, right? These are questions on cross by the defense, right? No, this is, yes, I apologize. This is the defense attorney. I apologize. And then on redirect, the prosecutor says, Mr. Solor, was this your intent to come in here today and lie to the jury? And he says, no, I won't lie. All along, he's been lying. Now, as far as this prosecutor, the court should recognize that this very same prosecutor was at Mr. Solor's plea and sentencing. And there, he specifically told the judge at Mr. Solor's sentencing, and it is the prosecutor saying it this time, the state has represented to Mr. Solor's counsel. And he uses the word represented. That in the event Mr. Marquez chose to proceed to trial and that Mr. Solor's testimony would be needed and would, in fact, be forthcoming and proffered truthfully, the state would sort of come off the felony murder, which has 25 years, and charge various counts of robbery. So this just comes back to the materiality, though, right? The Connecticut Supreme Court assumed for the sake of argument there was this agreement. So I don't see why you're trying to prove there's an agreement, because Connecticut Supreme Court assumed there was and said even if there was, it's not material. And I guess I would come back to this notion that given that Mr. Marquez admitted in his post-arrest statement that he was in the apartment and he held the gun, I don't see the difference. His position was that Mr. Solor was the gunman. That was his position. Right, but now we have the eyewitnesses who said he was the gunman. And again, but then- Hang on. And then it seems to me that all your identification arguments go out the window because Mr. Marquez admitted he was there. So the only real identification dispute there would have been with respect to the witnesses is, was it so dark that somehow when they looked at the photo array and it picked up Mr. Marquez, should they have somehow recognized it as Mr. Solor? I mean, is there evidence that these two guys looked like twins or that they were easily confused? No, but there's evidence that during the incident, as I stated before, they had been drinking beer. They had been drinking Hennessy, half a pint of it. Hypnotique. So then your argument then is reduced to the fact that they were sober enough to absolutely correctly recognize him as the person who was in the apartment, but they were drunk enough to not remember who was the gunman. That's really what it boils down to. Yes. And they happened to get the identification spot on. Okay, so along that- That seems like a pretty narrow needle to the needle. Okay, so Your Honor, following along that argument, we have to remember neither Mr. Valle or Mr. Clement knew any of these robbers. They'd never seen Mr. Marquez or Mr. Solor before. They were drunk. They were drinking three hours beforehand. It took place, this robbery, at midnight. It happened very quickly. They admitted that they were both worried about the presence of a gun. They both left the room during a struggle and before any shots were fired at Mr. Delgado, and neither one of them were able to give a detailed description of the shooter's appearance. That being said, they did identify him later on in a photo array, but our position is- Well, one of them actually is the one who identifies them before law enforcement. Mr. Valle. Right. Correct. That's a pretty compelling fact, isn't it? Well, Mr. Clement says he wasn't paying a lot of attention to how these people look and that he had considered choosing another photograph. Well, we know they got it right because Mr. Marquez admits he was there. So it's not like they picked the wrong guy off the street. They actually are remembering one of the guys in the apartment. Right, but whether or not he was the shooter or not, they're not remembering that. Right, but it seems like now we're dealing with wild coincidence that somehow their memories are conceitedly so good that they absolutely have identified the guy who was in the apartment, and yet you're reduced to arguing, but their memories are so bad- Well, Mr. Clement's memory wasn't so good because he equivocated before he chose- He was going to pick somebody else before he won. But he got it right. That could have been sheer luck. I mean, guess on a multiple choice exam. There's a couple of choices, and more often than not, if you at least try to fill in or circle the remaining ones, you're going to guess right a couple of times. Well, all right. I mean, I have nothing further to say on this other than what's in my brief. If the court has no further questions, I rely on my brief. All right. Thank you both. We will reserve decision.